May it please the Court, Kelly Chivianski on behalf of State of Arizona and Governor Brewer. I'd like to reserve five minutes for rebuttal, please. Your Honors, there are three independent reasons to vacate this injunction. First, it was Appley's burden to make a clear showing of their standing, and Appley's failed to meet that burden. Second is the lack of irreparable harm. This is a pre-enforcement challenge to a statute that was in effect for two years at the time Appley's moved for injunctive relief. If there are no factual findings by the district court or evidence in the record to support a finding, that these particular Appley's were likely to suffer irreparable harm absent injunctive relief. Third, Appley's are not likely to succeed on the merits of their preemption challenge because this statute is neither field nor conflict preempted. Now since the briefing closed in this case, the Supreme Court has issued a new standing decision, that is Clapper v. Amnesty International. In Clapper, the Supreme Court reaffirmed its existing precedent, which it characterized as well established, holding that any threatened injury must be certainly impending to satisfy Article III. The Clapper court also held that a plaintiff cannot circumvent that requirement by choosing to incur expenses to avoid harm that is not certainly impending or by alleging that the challenge statute had a chilling effect on its activities. Now, here there are four Appley's who have submitted evidence of their alleged standing to challenge this statute. The first is Lou Santiago, the class representative. Ms. Santiago lacks standing because her alleged risk of prosecution is not certainly  Ms. Santiago. Sotomayor, did you, did the State raise a standing issue at the preliminary injunction hearing? At the preliminary injunction hearing, no. The Arizona challenged Appley's standing three separate times. It moved to dismiss the initial complaint for lack of standing. It moved to dismiss the individual Appley's from the first amended complaint for lack of standing. And in response to the motion for Ms. Santiago's standing. Does it make a difference that you didn't challenge, you didn't attempt to challenge the plaintiff's standing at the preliminary injunction hearing? No, for a couple of reasons, Your Honor. Arizona did make a factual attack to Ms. Santiago's standing in response to the motion for class certification. The court issued its ruling on that motion while Arizona was preparing its response to this preliminary injunction motion. And in that ruling, the district court said that it had already found standing, referring to its finding at the motion to dismiss stage, and said that it would not revisit the issue of standing. And in that ruling, the issue was that the court was applying the incorrect legal standard. It wasn't a factual dispute as to the alleged facts or evidence in support of standing. And also, Arizona did challenge the showing of irreparable harm. And in their reply brief in support of the motion for preliminary injunction, Appley's characterized the irreparable harm argument as just a reassertion of the standing arguments. And in defense, it said the court has already addressed this issue and it referred to the standing ruling at the motion to dismiss stage. So it construed the arguments to be the same and defended accordingly. In addition, this Court does have an independent basis to address standing, regardless of whether we had ever addressed it. And that's what the Ninth Circuit did in Chapman v. Pier 1. Imports had never been challenged by the defendants below, but the inbank panel reversed with instructions to dismiss for lack of standing. And in Summers, the Supreme Court said that. Breyer. Nobody disputes that. It's just what is the record that we're looking at for purposes of standing? Well, there were. When you challenge it, when you challenge standing on a motion to dismiss at the pleading stage, you look at the allegations in the complaint. Correct. And in this motion for preliminary injunction, Appley's did submit evidence to support the alleged irreparable harm of four particular Appley's. And I think there are two ways this Court can find no standing. First, I think the allegations in the first amended complaint. Mr. Lansky, can I interrupt just for a second? Sorry. If we look at the pleadings to determine standing, right? I'm with you on that. Yes. And we look at ER 350, paragraph 23 of the complaint. It alleges Ms. Santiago also provides shelter to persons who seek sanctuary. And I want you to concentrate on the word sanctuary. Sanctuary, as I understand the term, and it's an old term with a great many meanings, but one meaning is it gives shelter, to give shelter to people to avoid arrest. Right? Why doesn't that fit perfectly under 13-2929, subsection 2? Well, Arizona, the statute also requires the contemporaneous commission of a predicate criminal offense. How do you know that? It has a very strange language. It says, if I can remember it, it says, it's unlawful for a person who is in violation not of a statute, not of a law, but of a criminal offense. How do you violate an offense? I mean, isn't that sort of an absurd way of writing that? I didn't construe it that way. I think it means a violation of any criminal offense. Well, how do you construe it differently? You know, we sent an order to you asking you to respond, and you missed the point. I don't know how. We said, what does this mean, violate a criminal offense? How do you violate an offense? Just spell it out, please. And my understanding is that you have to be violating, there has to be. Well, look at the words. How do you violate an offense? Do you know what the word offense means? Yes. Violate a statute. Violate a crime. Violate a statute, I think, would be better wording, but I construe it. It's not no better wording. It's nonsense as it stands. How do you violate a crime? I don't know. That's why we sent an order to you to explain it, and you missed the point. Well, because as I read the statute, Your Honor, it means to violate. But you're misreading the statute. We're asking you now, having given you a week to think about it, what does it mean to violate a crime? Well, the district courts also found in this case that the district court's construction of that provision was that there had to be the commission of a contemporaneous criminal offense. And I read it the same way. You missed the point. We have raised the point, and we are asking you, representing the State, to explain  How you violate an offense? How do you violate an offense? I don't know, Your Honor, how you violate an offense. It's kind of incomprehensible, isn't it? Well, I've always believed that it means that you're violating a criminal law or a statute. You believe that? We look at the words of the statute. The words of the statute are different. I understand. And you violate an offense. I understand, Your Honor. I've always construed it to mean a crime. Well, why don't you conceive the key? It may actually work to your benefit. Well, I. You've got an incomprehensible statute. Well, with respect, Your Honor. You can't just snap on it and say, well, the statute makes no sense, so it can't sentence anybody. With respect, Your Honor, I understand the statute to mean that you have to engage in a critical. No, no. I know what you understand, but it's got to be your understanding has to be anchored to the words of the statute. They can't be something cut by you in your mind. I understand. You've got to look at these words and tell us how these words mean what you say they mean. The legislature had to have meant something by it. And I think the only reasonable construction that. No, it's an unreasonable statute. You can't. You've got to focus on the words. If you can't do that, then you better conceive the point. Well, with respect, Your Honor, I do believe that the legislature intended. I think the purpose of construing a statute is to try to determine what the legislature intended, and the legislature obviously intended something by inserting those words. Well, we were asking you about that. Are we free to make up the words the legislature should have used? I think it has to be based on the most reasonable construction of the statute. Let me throw you a lifeline. Okay. Did the district court interpret this phrase as meaning a violation of a criminal statute? Well, yes, in two instances, Your Honor. Was that a reasonable interpretation? I believe that's. Should we defer to that? Yes, I do believe so, Your Honor. That's the lifeline. I've always believed it that way. Thank you very much, Your Honor. Does it make a difference how we interpret it? Well, for standing purposes, a plaintiff to establish standing, a plaintiff has to articulate concrete plans to violate the statute. And if a plaintiff doesn't allege concrete plans to violate all essential elements of the statute, then they haven't alleged an intent to violate the statute. And so if the statute does, in fact, require the commission of a contemporaneous criminal offense, then there would have to be an allegation to that fact. And, in fact, a court can't actually presume that a plaintiff is going to violate a valid criminal law. So my hypothet, if Ms. Santiago gives sanctuary, as it's been known in our traditional culture for 2,000 years, given in monasteries and other places, to avoid arrest, if she were to give sanctuary, would she be committing a crime in giving sanctuary? I don't believe so, Your Honor. I'm not aware of that. There wouldn't be any prosecution under this statute. No, I don't do not believe that that would violate. If she were giving sanctuary as a condition of the person benefited becoming a prostitute, then she would be committing a violation of a statute and giving sanctuary. That would cause her to be prosecuted. I'm sorry. I don't understand the question. I'm trying to think of a situation where giving sanctuary has a predicate crime, right? Yes. If she were to give sanctuary on condition that the person benefited would become a prostitute, right? Okay. Yes. Then she would be committing a violation of a crime, and then Section 2 of 132929, that would be invoked. Yes. Is there any indication that she's pleaded an intention to violate subsection 1 or subsection 2 or subsection 3 of 132929 in connection with the violation of a statute? No. I'm sorry. I don't believe so. I hope I understood your question. And for instance, she's not saying I'm going to speed and violate a statute and transport an illegal alien. Well, speeding for what? There is no evidence suggesting that she's going to speed at the same time. That's right. But speeding is also not a criminal offense, correct? It's a civil offense in Arizona. But driving while drunk is a criminal offense. Correct. She's not said I'm going to drive drunk and move an illegal alien. Correct. Exactly right. And therefore, your position is that she hasn't stated any facts or allegations as far as standing. Correct. Which would invoke 132929. Correct. That is exactly State's position. What case do you rely on for the proposition that she has to state concrete facts to show that she's going to violate the law, however it might be interpreted? There are several cases, Your Honor. San Diego Gun Rights, San Diego County Gun Rights Commission, the factors. What facts in San Diego Gun Rights in that case support your argument that you just made? What facts support the argument? Yes. What facts did they? What was the circumstances of that case that allows you to make that statement that you just said? In that case, plaintiffs allege that they might violate the Gun Rights, Gun Control Act, and. . . Did they offer any facts about what they had done? I don't recall specific. . . How they conducted themselves. They didn't, did they? I don't recall specific facts. There must be no facts in that case. I don't recall specific facts, but the Court did say that it looks to whether there are concrete plans to violate the statute. As I understand the Supreme Court's law in this area, a plaintiff like Ms. Santiago has to allege some facts that would give her a credible, a fear of a credible threat of prosecution. Well. . . A credible. You know, when Judge Bea talks about sanctuary, why isn't that, and what she does and how she does it, her affiliation with the church, her concern for undocumented people and whatnot, why isn't that on her part a reasonable person in that position? Why wouldn't a person like that have a credible fear of prosecution under this statute? This statute seems to cover that very activity. Well, first, Your Honor, I disagree that the statute does, in fact, cover that activity. I mean, I. . . The purpose of the statute. The purpose of the statute is to punish criminals who engage in this type of activity, who facilitate the criminal activity associated with illegal immigration, such as somebody violating the Federal statute that also does so while engaging. So is there an exemption for somebody who's out to do good in their terms of what a good is? Out to do good? Well. Well, Ms. Santiago, she feels that what she's doing is a worthy thing, providing sanctuary, providing help, providing assistance. Well, if Ms. Santiago. . . Does the statute exempt that activity? If Ms. Santiago were to engage in the type of conduct that would violate the Arizona statute, she would also be violating the Federal statute. And, no, there is no specific or general exemption for people who do good, but I don't think people who are doing good would violate the. . . Not in two cases. I'm sorry? Not in two cases. If Ms. Santiago were inducing someone, an illegal alien, to come from New York to Arizona, that would not be a violation of the Federal statute. It would be a violation of Subsection 3 of 2929. Correct. There are no facts in the record suggesting that Ms. Santiago has any intent to do that. Well, but you said that she would necessarily be violating a Federal statute. I was referring to Ms. Santiago's alleged conduct. If Ms. Santiago engages in the conduct that she says that she intends to engage, if she's not violating the Federal statute, she's not violating the Arizona statute. So is she violating the Federal statute? Not in my understanding of the Federal statute. There's nothing in here that, in my view, reflects an intent to shield people from immigration. Sanctuary? I think that's pretty vague, what is sanctuary. I mean, that doesn't say that she tries to hide them from Federal authorities. Well, she's certainly trying to have them avoid arrest. That's what sanctuary is all about. I think that is a possible construction of the word sanctuary. I don't think this provides the kind of particularized facts that, to me, suggest a violation of the Federal statute. But, again, if I could address the preemption arguments as well. This statute is neither field nor conflict preempted. I think that in Gonzalez v. City of Peoria, a panel of this circuit already found that Congress did not intend to ---- Why didn't you cite Gonzalez v. City of Peoria in the opening brief? To be honest, Your Honor, I just ---- Isn't it sort of sandbagging the appellee to cite it now? I don't believe so, Your Honor. It was in the reply, and there was no ---- I mean, it is the precedent of this Court. The Gonzalez Court did specifically hold that there was no field preemption, that Congress did not intend to occupy the field of Federal criminal immigration enforcement, relying on the same statutes that appellees rely on here, and characterized as ---- But that was a very limited, narrow issue, correct? Well, I ---- it specifically found no field preemption. And, true, it did not address conflict preemption, but it specifically found no field preemption. And it's not that the court doesn't want to follow what the 11th Circuit did. It's that the court doesn't want to follow what the 11th Circuit did. Let me ask you this. Why would we not want to follow what the 11th Circuit did? Several reasons, Your Honor. Why? Several reasons. We're dealing with some statutes that fit together in a scheme. Right? 1324, 1323, 1325, 1326, they're all related. Well, those are the same statutes that the court addressed in the Gonzales case. It's a scheme that the government, that Congress passed to deal with people who are in this country illegally. Well, there are lots of Federal statutes that could be characterized as a scheme. I think that's a very, you know, generalized language that could apply to them. It seems to fit together rather nicely. I don't see how this Court could reach that finding consistent with the Gonzales Court's analysis. Well, the 11th Circuit, did the 11th Circuit have any difficulties reaching that conclusion? The 11th Circuit isn't bound by the prior precedent of this Court. And the 11th Circuit's finding of field preemption relied substantially on the Arizona Court's analysis of the alien registration statutes. And those are very different here. Those are, there are a lot more statutes, there are a lot more regulations, and the Court had previously found field preemption in the Hines case. And the alien registration statutes are also different in that they regulate aliens as a distinct group, and this statute does not regulate aliens as a distinct group. It regulates criminals who facilitate illegal activity. And the 11th Circuit was also incorrect in its field preemption analysis in that it looked for a specific invitation from Congress to invite State activity, and that is not the standard. The 11th Circuit's finding regarding conflict preemption, I also think this Court should not follow that analysis for several reasons. First, the conflict preemption analysis relied substantially on the finding of field preemption, and because there's no field preemption, I don't think that should mandate a finding of conflict preemption. The 11th Circuit also found that Congress had intended to limit jurisdiction to Federal courts to construe the Federal crimes, and the 11th Circuit's finding at that point didn't address the language of the Federal jurisdictional statute, which is 8 U.S.C. Section 1329, and it did not address the Supreme Court precedent on that issue, such as Taflin and Yellow Freight. And I think the California Supreme Court was correct in its analysis of 8 U.S.C. Section 1329 in its unanimous decision in En Re Jose, where it did apply the applicable Supreme Court precedent, and it did find that Congress did not intend to limit jurisdiction to the Federal courts. And the third part of the 11th Circuit's conflict preemption analysis that I think distinguishes it from this case is that in the 11th Circuit cases, it relied on facts in the record regarding the Alabama and Georgia statute, and it also relied on certain provisions in the Alabama statute that are not consistent with the Arizona statute. For example, in the Georgia case, there was unrefuted evidence in the record from law enforcement officers that any minor traffic violation could trigger the provisions of the Georgia statute, and there is no such evidence in this case. Also, the Alabama statute has three substantive differences from the Arizona statute. One is that there is no requirement of a predicate criminal offense. Two is that the Alabama statute makes it a crime to harbor a person by entering into a rental agreement with an unlawfully present alien. There is no provision like that of the Arizona statute. And the third difference is that the Alabama statute makes it a crime to conspire to transport, which the 11th Circuit found could be used to punish somebody simply for something as benign as agreeing to be a passenger in a vehicle, and that is not true under the Arizona law. And I see I've run over. I would like to reserve the remainder of my time for rebuttal. Good morning, Your Honor. And may it please the Court. Omar Jadwat for the plaintiffs. The Federal courts, including the 11th Circuit, have unanimously disapproved of State harboring laws like Section 132929 because they fail the tests of the State Supreme Court set out in its Arizona decision in four ways. Section 132929 goes far beyond the specific role that Congress allotted for the State in 8 U.S.C. 1324C. Second, it removes the Federal government. In 1324C, the allotted role of the States as to the enforcement of Federal law, as to the enforcement of Federal law, is to arrest but not prosecute. That's right. It doesn't say anything about there's not a word in 1324 saying the States will not be allowed to prosecute their own actions under State law. Well, that's true, Your Honor. All right. What's your next point? The point is that Congress made that decision in the course of deciding how to deal with harboring and other activity that assists illegal aliens in the United States. It says as far as Federal law is concerned, only under 1329 Federal prosecutions can take place in district courts, but arrests can be done by State officials. That's all it says. That's right. And our view is that the Congress made that decision in the course of thinking   That's right. Let's try to stay away from trying to figure out what Congress was thinking about, as my readers. Why don't we just pay more attention to what they said and enacted? Yes, Your Honor. But in the same way that the Supreme Court, when it addressed Section 6 of Arizona, looked at the statutory scheme, looked at the authorizations that Congress provided. And did not find it was field preempted. No, it found that it was conflict preempted. Conflict preempted, but not field preempted. That's right. I thought that you were arguing this was field preempted. We're arguing both, Your Honor. Well, it was field preempted. Okay. So, I mean, to move on to field preemption, in very much the same way that the registration provisions that were addressed in Section 3 create a comprehensive Federal scheme that can't be supplemented by the States, Section 1324 and the other provisions that surround it address in a comprehensive way, they prescribe the full set of standards addressing the provision of assistance to noncitizens who lack authorization to enter or remain in the United States. And you think that the provision by the Federal Congress of a full system of enforcement of a certain type of criminal law precludes the States from entering that field? In the context of this, of the INA and the fact that this is a central feature of what the INA accomplishes, I think it does, Your Honor. And I think that's the reason why in Hines and in Arizona the Court found that this was not the registration schemes which are actually less central and more discreet in certain ways from the rest of the immigration laws and newer, that those provisions still amounted to a field preemptive regulatory scheme of Congress. Can I ask you, counsel, there is no field which is more exquisitely structured by the Federal Government as to what constitutes a crime, how the case is to be tried, where the case is to be tried, what sentences and Federal drug enforcements, right? Now, because we see them all the time here, right? That doesn't stop California from enforcing its own methamphetamine possession trafficking cases, does it? Sure. And I'm not saying that the rule that applies to Well, there has to be something particular about immigration as opposed to drug enforcement. And there is something in particular about immigration. As the Supreme Court recognized repeatedly in the Arizona case and as it's recognized repeatedly over the years, immigration is not like any other area of criminal law or of civil law. Justice Brennan tells us in Duqanis, Federal regulation should not be deemed preemptive of Duqanis-involved illegal aliens, right? Yes. 1976 case. I'm aware of it, Your Honor. Not too many whiskers on it, right? Okay. Federal regulation Certainly less recent than the Arizona case, but Federal regulation should not be deemed preemptive of state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, the nature, or that Congress has unmistakably so ordained. There's no express unmistakably so ordained here. So it has to be the nature of the subject matter. But let's look at what the Court actually did in Duqanis. Let's look at that. Yes. Because I see a big difference between Section 3 of SB 70, which layers on a state penalty to a Federal registration requirement, and Section 1324 at Seek and 13-2929, the Arizona statute. There's no possibility that Arizona could ever install and operate a nationwide alien registration system, is it? It would be useless for Arizona even to have an Arizona alien registration system because they come from other 49 states. But for the Federal government, it's the sovereign state. That's the language used by Justice Kennedy. It's a task given to one sovereign state. That's the Federal government. But in the case of the movement of aliens and harboring of aliens, Arizona has an interest totally different from the Federal interest, which is to keep aliens out of the country. They're worried about what happens to the aliens when they're here, what happens to them not only by other aliens but by other American citizens who exploit them, who put them in child trafficking situations and prostitution and that sort of thing. That's a different nature. Isn't that what Justice Brennan was quoting when he said, the nature of the regulated subject matter permits no other conclusion? Section 3 is quite different from what we're talking about now. So if I might, I'd like to address three different aspects of the question that you just asked. First, I'd like to talk about Dukanis. Second, I want to emphasize the way that the Arizona case and the way that it approached Section 3 gives us some of the answers in this case. And then third, I want to talk about what the idea that this is Arizona acting purely in a local capacity. First, with respect to Dukanis, in Toll v. Moreno, the Court explained that Dukanis ultimately turned on the question about whether there was affirmative authorization by the Federal Government for the State to engage in the regulatory activity it was discussing. Secondly, and importantly, in Dukanis, the question that the Court focused on in its analysis was not simply the question of whether this was a – whether there could be field preemption in immigration. In fact, the question that made the difference in Dukanis was, had Congress addressed in the immigration law the sort of activity that California was trying to regulate? And at that point, they had not, Your Honor. In 1952, they had passed a statute, 724 – 1324a, making it a crime for any person to employ an illegal alien. Yes, but they also – they also, as the Court explained in Toll, they also invited complementary State regulation. And here, there's no invitation. Secondly, at most, the Court found – the Court found in Dukanis that at most, what the – what the – what Congress had done was to address the employment of – of aliens in a – a peripheral manner. There's no question that today the holding of Dukanis would no longer be true, right, because what we have is a comprehensive regulation of the employment of aliens as a central feature of the INA, and that's exactly the case with respect to harboring. That's exactly not the case in Arizona v. USA. Section 5C was not struck down on field preemption. It was struck down on conflict preemption. So the Court did not find that it wasn't field preempted. No, but it didn't even consider it. So you can't say that that is the subject of – of field preemption. I – I – respectively, I disagree that what the Court didn't say about field preemption has any kind of actual meaning in terms of whether there was field preemption in the case. Can you cite no case that says that employment regulation today is field preempted as far as the illegal aliens are concerned? No. Look, there's – there's a different – there's an express preemption provision at issue in – in 1324a.H.2, right, that – that kind of changes the analysis in that case. But I think the basic point is that Dukanis would have come out differently, and I think it's – it's really hard to argue differently, that Dukanis would have come out differently, would not have been analyzed in the same way if the INA that's in place today was in place in 1976 when the – when the Supreme Court had that case. I'd also like to make the point, Your Honor, about Arizona, and you'd mentioned Section 3. So you think that Dukanis is no longer good law? No, Your Honor. I'm saying that Dukanis' analysis is instructive, but that the actual holding in Dukanis would be different today. I think with respect to the Arizona decision and how it analyzed Section 3, we have to look at the fact that one of the reasons that the Court found that Section 3 was preempted was because what Section 3 did was it took the Federal government out of the process of enforcing that aspect of immigration law. There's a similar reason to why it found that Section 6 was preempted. And in taking the Federal government out of the process, you open the – you open it up to damage to foreign relations, you open it up to the fact that people could be prosecuted, who the Federal government would not choose to prosecute in the exercise of their immigration authority. And that is a fundamental problem both with Section 3 and with Section 6 and with this law here, Section 29. Is it your submission that one of the – the State cannot adopt a law which would infringe the Federal government's discretion whether to prosecute? I mean, I think that's – I think that one of the problems with Section 2929 is that it takes away that discretion. And that's a basis for preemption. In other words, if the government decides not to, in the words of the Constitution, faithfully execute the laws, the State can't legislate in its place. But what the Supreme Court recognized in Arizona was that it's not a – the Federal discretion is part of the system that Congress created. It's not failing to exercise the laws faithfully, to exercise discretion to try to reconcile the various goals that are present in the Immigration and Nationality Act. And that's a fundamentally Federal prerogative, a fundamentally Federal responsibility because of the effects that it has. Whether to enforce the laws or not is a Federal responsibility. How do you enforce the laws, for example, with respect to somebody who has deferred action because they're a dreamer who's been a – who's gotten deferred action from the Federal government? Arizona looks at that person as an unlawful alien, somebody who's here without authority. They can prosecute them for self-harboring, prosecute them for self-smuggling. That makes no sense in terms of the Federal law. But by allowing Arizona to cast the Federal government out of the process of enforcing these harboring provisions, that's exactly the problem you have. So you've only got about a minute left, and I'm just wondering if we could just switch a little bit. I'd like you to respond to the standing argument. Yes, Your Honor. I want to emphasize, just at the outset, there's obviously organizational standing here as well. I'd point out at page 317 of the excerpts of record, we have the interrogatory responses, which are from 2012. The point that Judge Noonan made with respect to the clause in 132929. Yes. In violation of another offense. Right. Does that make a difference from your perspective? Not to the merits at all. It makes the defendants say that it makes a difference in terms of standing, but I would say that it doesn't. Because I think the question that Babbitt asks and the question that this Court asked in California pro-life in the Planned Parenthood of Idaho case is, is there a reasonable risk, a reasonable fear that this statute could arguably apply to the behavior that's being alleged. And I think that even taking the State's interpretation, that that language requires a criminal, a predicate criminal offense and that that predicate offense could be a violation of Section 1324, that providing sanctuary, providing transportation if you're driving 35 miles per hour in a school zone, all of these things could in fact lead to prosecution under the Federal, under the Arizona law. And I think, again, I mean, in Babbitt, the same essential argument was made by Arizona in that case, which is that, well, there's no standing here because this law isn't going to apply to the behavior that's at issue. But in Babbitt, and that was a statute that had never been enforced, but in Babbitt, the Supreme Court said no. There's standing as long as there's a reasonable fear on the part of the plaintiff. And I think the other reason that this may be, the extent to which the State's response as to in violation of a criminal offense makes a difference is that you see that the State is really struggling to kind of come up with an interpretation of what that language means. And the fact that even after all the briefing and as we stand here today in this case, that the State is still not coming up with a clear explanation for why Ms. Santiago doesn't have a reasonable fear, just, I think, underlines the fact that she does, in fact, have one. Roberts. Thank you. Your time is up, and I think we, the government, we allotted 10 minutes for the government. Mr. Stern. Stern. May it please the Court. The Supreme Court in Arizona in reviewing this Court's decision. Keep your voice up, Mr. Stern. I'll try, Your Honor. The Supreme Court in reviewing this Court's decision reaffirmed several key principles that I think guide the analysis of this section in the same way that they guided the Supreme Court's analysis of Section 3 and the other provision of Section 5 that the Supreme Court was reviewing in that case. The Constitution confers sole authority to regulate immigration in the national government. It does so in part because of the close relationship of immigration regulation and foreign policy. But, Mr. Stern, the Arizona statutes are not limited to regulation of immigration. They don't say anything about who can come to Arizona. They don't say anything about how long the person can be in Arizona. They don't say anything about having to leave Arizona. They apply to an American citizen who harbors or transports, right? So it doesn't have to do with immigration. Well, Your Honor, I don't think that the issue is whether a statute exclusively applies directly to an alien as opposed to someone who is doing business with or assisting or maybe a family member of the alien. And let's be clear that, I mean, this would apply. This statute is written in the broadest possible terms. It is not restricted to commercial interests. It applies across the board. Any person. It says any person. That's right. It applies across the board. And to say there's no basis for concluding that the only form of immigration regulation is something that applies directly to the immigrant or the alien, if, for example, people are told that you can't rent to an alien, you can't provide them with any service, you can't provide them with schooling. These are all. Well, you can't hire them like they did in Duqanis and the Supreme Court says that's fine. That's right. And, again, the court, as my colleague pointed out, the court in Tolman v. Moreno, and we quote this in our brief as well, explicitly held that Duqanis turned on the fact that there was an invitation on the part of the states to regulate. And let's remember that in that case, the states were at least regulating in an area of traditional state authority. Here, this is just a straight out immigration harboring statute. This is not part of a sort of regulation of employment, housing, or anything else. This is just, well, the federal government's got a scheme regulating harboring and transporting illegal aliens. We're going to enact the same scheme and we're going to make it a state crime and it's going to be prosecuted by our people using our discretion and it doesn't matter whether the federal government would choose to bring prosecutions for the same offenses or not. And what Justice Kennedy made very clear in Arizona was that the role of discretion on the part of federal prosecutors and law enforcement is crucial in the operation of the immigration statute and that it's sort of the whole scheme is premised on that sound discretion and that the federal government, unlike the states, is going to be cognizant and responsive to the concerns of all the states in the country as well as foreign countries. If the role of discretion of the, go ahead. I want to return to an issue we explored with counsel on the other side, the meaning of violation of a criminal offense. Now, you heard the discussion and we'd given them a week's notice and they didn't seem to me to produce any rational explanation. And we're not here to pass on gibberish. Violation of a criminal offense makes no sense. How can it be a threat to anybody? Unless one would have a point for them. There's no teeth in this because it's nonsense. Well, if the statute were effectively to be declared a nullity because it cannot apply to anyone, that would indeed not be a problem. I think that while it was a very inartfully drafted statute. Well, inartfully is a kind word. It was incomprehensibly drafted. They made no sense of it. They had a week to think about it. They came up here and said, no, it means something. They couldn't explain it. If, again, if the Court were to conclude that the statute cannot apply to anybody because of its wording, I suppose that would satisfy the concerns of the plaintiffs as well. Right. Of the drawing boards. Yes. And then, of course, presumably we would be back here after a couple of words were altered, and we do know what the district court thought of the statute, and we're accepting the. Does it make a difference? No, it makes no difference whatsoever to. Why not from your perspective, from the government's perspective? Because the Arizona has no authority to enact its own penalties and its own substantive provisions that mirror the federal government's, and if it's violating another provision of Arizona law, of course they can prosecute the alien for violating a separate provision of Arizona law. Never suggested otherwise, but the other possibility that's raised in the state's case is that it would be satisfactory if the violation were one of the federal anti-harboring statute. That's what Gonzales held. No. I think, Your Honor, with respect, that what Gonzales holds, there is a specific carve-out for enforcement arrest authority, and we do know that, I mean, what the statute, cooperation. And in that case, the Supreme Court looked to guidance provided by DHS and ICE about what cooperation would be. Here we are in a better position. We can look right to the statute itself, and we know what cooperation means. Cooperation is the arrest authority. There is nothing that suggests, and all principles of preemption law preclude the idea that the State can enact its own parallel scheme of penalties and its own entirely separate enforcement mechanism. That's what the – that is what Arizona teaches us plainly. That's exactly what happened in Gonzales. Section 2508 of the California Code prohibited the employment of illegal aliens to drive down the price for labor contractors. And at that time, and since 1952, the hiring by an employer of an illegal alien was also a Federal crime. So why can't Federal – State actions mirror Federal statutes? Well, when there is an independent authority that hasn't been preempted by a comprehensive scheme, there is – and we have both – we do not have an independent general authority to regulate the harboring of illegal aliens. We do have the – it's really hard to put together a more comprehensive scheme. And this Court also in Gonzales said that this scheme regulates, the harboring scheme regulates from beginning to the – sort of beginning to end every aspect of the alien's treatment. And the State statute essentially just mimics it, except that it also conflicts with it by dealing with a intrastate immigration scheme, which once more fundamentally underscores what's wrong with a State-by-State approach. The national government has to deal with the problems of immigration on a national scale. We cannot have States adopting a patchwork of varying penalties to say, if you induce somebody to come into my State, you are going to prosecute you, while another State is going, no, that – we would find a policy like that to be offensive, but it's going to put it in a sort of disadvantageous position for other reasons. That's why we have a national government to deal with matters of national concern. Mr. Stern, you agree that this is a facial challenge to the Arizona statute? Well, certainly the United States' challenge is a facial challenge. Now, if it isn't – under Salerno, if there is a situation or a circumstance where it would not be unconstitutional, then we have to depart from your position. Well, I mean, Salerno has been the subject of, like, various interpretations, but our position here is that this statute, for the same reasons essentially as the statutes that were held unconstitutional in Arizona, that they cannot – they are preempted. They cannot be properly – but, again, Arizona can certainly prosecute its own State crimes. What it can't do is to recodify provisions governing harboring and transporting of illegal aliens, make them State crimes with separate or additional penalties subject to the discretion of State prosecutors. I mean, that's what the Eleventh Circuit very correctly held in the Alabama and Georgia cases, and it follows directly from the Supreme Court's reasoning in Arizona. And the State, in sort of its presentation today, essentially says the same kinds of things that the State said to this Court a couple of years ago and to the Supreme Court when it reviewed this Court's decision, and those reasons don't have any greater traction now than they did then. Mr. Stern, your time is just about up. I have one minor question for you. What's the status of the cert petition in Alabama's case? It's filed, and I believe we filed our opposition. I can certainly check and get back to the Court on that, just to let you know for certain. Thank you. Thank you, Mr. Stern. Thank you, Your Honor. To answer the question regarding the status of the Alabama petition, Alabama's reply brief was filed today. Today? Yes. The United States filed its opposition brief on March 21st. Okay. I just want to make a couple points. With respect to the Arizona court's holding, I agree, of course, with Judge Bea, that the Arizona court did find only one statute field preempted, and the other two provisions that the court found preempted were based on specific conflicts between those laws and congressional purposes, and there are no such specific conflicts here. Also, in the Dukanis case, the Supreme Court specifically found no indication in the wording or the history of the INA that Congress intended to preclude all State activity, and I think the arguments that Appley's and the United States advance here would essentially lead to a conclusion that any area that is touched by the INA necessarily precludes any State activity. Unless the government says accept it. Correct. And in Chamber of Commerce v. Whiting, the 2011 decision of the Supreme Court, the court did both an express preemption analysis, field preemption analysis, and a conflict preemption analysis, and it found that even though the Arizona law did provide greater enforcement and greater requirements such as mandatory E-Verify requirements, that that did not interfere in any way with the Federal government's operation of its statutes. To address organizational standing, the allegations regarding the organizational plaintiff's standing are incredibly vague. There are no specific facts regarding how this particular statute has affected the organizations, and to the extent the organizations allege that any members, staff or volunteers face any sort of risk of prosecution under the statute, there are no facts suggesting that there is any reasonable probability, much less certainly pending, risk of prosecution there. For example, the allegations say such things. These are pretty small organizations, right? I'm not completely familiar with the size of each one of these organizations. I'm reading that I think there were some interrogatory answers that were submitted by one of the. Correct. Arizona South Asians for Safe Families. It looked like a pretty small organization. It looked like they operated on volunteers. I believe that's correct. And as a result of this SB 1070, they had to divert their resources to government. They've asserted a conclusion that they've diverted resources, but there are no particularized facts or supporting evidence suggesting that they have, in fact, diverted resources. There were answers in the interrogatories, right? Did you take their deposition? Arizona South Asians for Safe Families, no. But if you look at the that those discovery requests were specific to the issues of standing, and, you know, the request asked for particularized facts, expenses that were incurred, it asked for specific details. And specific details were not provided in that. Did you move a further answer? I'm sorry? Did you move a further answer? We are continuing to engage in a meet-and-confer process. We are still trying to press for more specific responses to those. So, yes, we are continuing to work on that, but that is not we're not done with the meet-and-confer process on that yet. And with respect to the reasonable fear of prosecution, the Clamper court specifically rejected the Second Circuit's finding that standing could be based on a reasonable likelihood of possible enforcement. So I don't believe, to whatever extent that may have been suggested in some of the Supreme Court's prior precedent, I think under Clamper. Clamper arose in kind of a unique circumstance, right? It did, but the court did not limit its holding or analysis. It did, but it referred to the standard as well established, and it relied on a bunch of its prior cases that were not in that unique standard, such as Daimler-Chrysler, Lujan, the Babbitt case. It referred to a bunch of prior precedent that came up in all sorts of contexts. Also, this is a pre-enforcement facial challenge, and to the extent a lot of the arguments here are based on presumptions about the manner in which this statute could be enforced or applied, for example, presumptions about the way the conspiracy, Arizona's general conspiracy statute may be used in connection with this statute, presumptions about the manner in which this statute can be applied do not provide a basis to enjoin this statute on its face, as the Supreme Court found with respect to Section 2B. The injunction should be vacated. Thank you. Roberts. Thank you, counsel. We appreciate your arguments. It's a very interesting case, and the matter is submitted at this time.
judges: Noonan, Paez, Bea